at all. We have Mr. Walden. Good morning, Mr. Walden. Your Honor, good morning. You have five minutes. Thank you, Your Honor. You can begin whenever you're ready. Thank you, Judge. May it please the Court, I'm going to get right to the facts of the case and then get into my argument. There is no question on the record that Ascent Pharmaceuticals is a duly registered manufacturer under 21 U.S.C. 822, not disputed. There is no question about the fact that it applied for procurement quotas under 21 CFR 1303-12. There is no question about the fact that the operative regulation requires the administrator. It literally says that the administrator shall grant the applications in accordance with the submission. And there is no question about the fact that that wasn't done by the statutory deadline of July 1st of 2022, 10, I'm sorry, seven months into the calendar year. In fact, that delay continued until 10 months into the calendar year when Ascent finally decided that it needed to file an action in federal district court seeking a determination on the quota application because its business was shutting down in the middle of a national health crisis on a scarcity of ADHD drugs. There is no question DEA does not refute the fact that Ascent... The delay, of course, was unfortunate, but, you know, you're asking for a mandatory injunction and I think you probably have shown irreparable harm, but what about, I mean, why is there a likelihood of success here? You're really asking us to order the DEA to permit these drugs to be sold in the U.S. market. Actually, Your Honor, to be clear, we're not asking that at all. The relief that we're seeking is much more limited. We have two issues that we have to address and we addressed only the issue that we needed to put before the court, which was the procurement quotas. The procurement quotas do not allow them to ship drugs. They need a manufacturing quota. They can't get a manufacturing quota until they get the approval. So, you know, there's a lot of arbitrary and capricious decision-making, which you know is extremely high standard. They did an audit. They're allowed to rely on this order to ship the quotas, Exhibit 12, and I know in your reply you addressed one aspect of it, one paragraph where you say they weren't the final drafts of the DEA form 22s, but there's a lot more that they allege in terms of record-keeping inaccuracies and violations. So how are you going to overcome that? How are you going to overcome that? Actually, Judge, it's not difficult at all because they don't rely on the record-keeping in denying the quota, right? The quota denial, it's Exhibit 13 in the record specifically, says that it lacks confidence in the data supporting the application. The data supporting the application has nothing to do with the audit. In fact, they take pains in their brief to say the quota review that was done has nothing whatever to do with the order to show cause that was served after the Federal court suit. They don't reference record-keeping violations in the quota denial at all. That's the problem with the quota denial. The quota denial says nothing. It's exactly like the Toros case, where in that case it had to do with another form letter that DEA exercised its final decision-making to deny someone informer pauperous status. The applicant there had detailed the problems with his finances and why he couldn't afford to pay for counsel, and DEA denied it simply saying that the showing is inadequate. The Toros case is directly on point here, and DEA doesn't contest it. They don't even address the Toros case. In this case, DEA didn't say anything about the order to show cause. In point of fact, they say in their brief that you shouldn't even be looking at the order to show cause. Now, as an aside, Your Honor, I wish I had more time because we submitted a six... In their papers to us, they say the record-keeping violations detailed in the order to show cause illustrate the magnitude of the concerns arising from DEA's reviews of assent's records. So I don't understand why you say they're not relying on the order to show cause. Because earlier in the brief, Your Honor, they very clearly say you shouldn't be looking at the order to show cause. What they were doing in that paragraph is by saying if you do look at the order to show cause, look at how serious it is. What they don't address, Your Honor, is that we submitted a 60-page detailed answer in the complaint showing that they looked at the wrong forms. Literally, these discrepancies that they claim exist are phantom discrepancies. They looked at the wrong forms. I've never seen something like this in 25 years of practice on the defense side, where an agency so cavalierly... And be mindful of the fact, just like in the Henderson case, they put this order to show cause together in the dead of night only after we filed an action in the Second Circuit. Even Judge Corman said that raises a suspicion of retaliation. Here, they put together an order to show cause that claims that there are discrepancies that do not exist. DEA and judges, this gets directly to your point, the Toros case controls. They have to, as a matter of APM, as Your Honor knows, the standard of review in this case is under the APA, under Section 557 of Title V. It is arbitrary, capricious, an abuse of discretion, or otherwise lacking in a lawful basis. Here, every single one of them apply. TORO stands for the proposition... I think your time is up, Mr. Walden, so we have your papers. Thank you. We'll hear from the government. Ms. Mittal. May it please the Court, Regent Middle for the DEA. As you've just heard, Assent received an initial quota decision from the agency with which it did not agree. But instead of presenting those objections to the agency through the proper administrative review procedures... Well, they don't have to, though. Their position is those are optional, they can evoke those, but they're not mandatory. They can choose to treat that as a final decision and come to the Court, right? Or is that wrong? Your Honor, that's wrong. The Assent has the option to pursue those administrative review procedures, and only then does the DEA issue a final decision from the administrator following an ALJ hearing. The regulations at 21... Is it too late for them to present the objections now, if we were to deny their application? If you were to... The 30-day deadline in the regulations for seeking an ALJ hearing has passed. They have presented their objections to the agency in the show-cause proceedings, and those objections are being considered by the agency in the context of both of the underlying proceedings at this time. The objections are presently being considered by the agency? The company's concerns with the allegations laid out in the show-cause order are presently being considered by the agency, but they have not been presented through the administrative review process, which means this Court doesn't have a final decision from the administrator with a record and factual... I understand that point, but, I mean, will they have an opportunity to be heard is what I'm asking. They will have an opportunity to be heard in the show-cause proceedings to the extent they seek to proceed with them. Those are stayed at this time at their request, but to the extent they choose to present those objections to the agency in either of the proceedings, they will be heard, and the time for an ALJ hearing in this particular quota proceeding has passed for them to request it. It had not passed at the time they filed their PI motion and at the time we filed our opposition, but if they were to go back to the... That's what I'm trying to figure out, is if they go back to the agency, is the will seriously consider any request from the age company to have their concerns with the quota proceeding considered. The regulatory timeline and deadline for that has passed. The agency's considering those concerns as we speak in both proceedings. Whether they'll be able to proceed with an ALJ hearing, I can't say it right now because that deadline has passed, but they're considering all of those objections in the two proceedings, which the company itself... They cite 21 CFR section 1303.34A that says a hearing will provide to any applicant or registrant who desires one. So they interpret that to mean that they can... It's not mandatory to... It's not a mandatory exhaustion. They cite our case in Washington v. Barr that says the Controlled Substance Act does not expressly mandate the exhaustion of an administrative remedy. So I don't know what's the government's basis. What case or regulation do you point to that says this is mandatory exhaustion? Your... Washington v. Barr itself recognizes that exhaustion is required before a petitioner or a registrant comes to this court seeking review of the agency's decision. This is the final decision of the agency insofar as they have not requested further review. But the reasons of the APA, it's final as a point in time, but it's an initial quota decision under section 877 under the Controlled Substances Act. Let's assume we disagree with that. We think it's final properly before the court. What's your response to... The government can see that there's at least irreparable harm to assent in terms of their ceasing to function, or the government disagrees with that? The government recognizes that they have alleged harm, but there's been no finding about the nature of that harm either by the agency or by this court. And so what's relevant in terms of finality here is that even if this decision is considered in some sense as final, whether under the APA or otherwise, there's an implicit requirement that any petitioner or registrant go to the agency and seek administrative review so that there is a record and a decision from the administrator. Section 877... The question is if we reach the merits, what is your argument? If you reach the merits, this company, there has been no final decision, but... We're going back to the same argument. How do you respond to the argument that with respect to procurement quotas, that that doesn't allow them to ship drugs? So the issue about potential harm to the public isn't a real one. Your Honor, I see my time is about to expire if I may answer. On the merits, the DEA has preliminarily concluded that this company has records showing that tens of millions of units of controlled substances are unaccounted for, and the DEA has the discretion under the regulations to deny procurement quota on an initial basis and then later on a final basis in order from the administrator. Mr. Walden says the government is not relying on the order to show cause and the allegations of the order to show cause. What's your response to that? The government quota proceeding expressly references the records keeping deficiencies that assent demonstrated that are documented in the order to show cause. They were issued concurrently. Both assent itself and its motion recognize that the two are intertwined in our brief, we recognize the two are intertwined. In his reply, he said that there's, with respect to the examples you cite of discrepancies that they were draft form 22s, that the final ones are accurate, and the government hasn't addressed that. What's your response to that? The government's looked at their records, not just the DEA forms, and continues to identify these discrepancies and continues to, has continued to conclude that based on their review of their records, there are, again, tens of millions of dosage units of missing oxycodone, hydrocodone, amphetamines, and other controlled substances. And so it's not just looking at the DEA forms that are required under the Controlled Substances Act, but looking at their forms, DEA continues to be unable to reconcile them. Those are issues that can be aired out in the administrative proceedings if assent chooses to pursue them, but this Court's never taken an initial decision from any administrative agency, allowed a petitioner to bypass the administrative review. In addition to their irreparable harm, they say there's going to be irreparable harm to the public, to consumers who need these drugs. What's your response to that? The DEA is balancing both those concerns, but also its responsibility to the public to prevent diversion of controlled substances. Is there going to be a heightened shortage of this drug as a result of, if they cannot distribute it? Is there going to be a heightened shortage, or are other manufacturers going to be able to fill that gap? So when DEA denies procurement quota to one registrant or entity, that procurement quota typically goes to other entities that have met the requirements DEA has laid out. There's a closed system of distribution, a certain level of aggregate production quota that's set every year, and then different registrants are given different amounts of procurement and individual manufacturing quotas. So the amount of the substance that's not given to one entity is given to another to make dosage form or other sorts of products. And so... Does that happen here, or do you anticipate that's going to happen? Well, so the quota that assent was denied in 2023 of certain controlled substances was allocated to other entities that then used them to make dosage form medications, some of the same, some different ones. I don't have an exact mapping of where those procurement quotas went, but they did go to other companies. I'm informed by the agency. Thank you. Thank you, and we are just... I forgot to reserve. Can I just have 10 seconds to address... You forgot to reserve? I apologize, Your Honor. Go ahead, 10 seconds. Honestly, the only point I wanted to make, Your Honor, is, and this is in the papers, on the day that they denied quota, they increased the national manufacturing quota for these drugs, right? They didn't give our quota to somebody else. They didn't have enough as it was. They had to increase the quota. They can't get the drugs. We're a billion dosage units short. Thank you, Mr. Wolden. Thank you. Both of you were reserved decision. Have a good day.